[Civ. No. 13491. First Dist., Div. One. Jan. 13, 1948.]

W. W. MacDONALD et al., Plaintiffs and Appellants, v. MAX L. ROSENFELD, Defendant and Appellant.

Bronson, Bronson & McKinnon for Plaintiffs and Appellants.

Fabius T. Finch for Defendant and Appellant.

WARD, J.—There appears in the clerk's record of this action for accounting and an injunction, two notices of appeal filed by plaintiffs W. W. MacDonald and John R. Pomfret: the first from an interlocutory decree, and the second from the whole of the final judgment. There also appears a notice of appeal by defendant Max Rosenfeld setting forth five designated grounds of appeal.

Plaintiffs' opening brief states as grounds of appeal that the whole of the judgment is erroneous and in defendant's brief it is contended that the court "erred in allowing plaintiffs a credit of $30,734.13." The latter statement is condensed but sufficiently definite to guide this court in determining the contention of the respective parties and the merit of each appeal.

The complaint sets forth that plaintiffs are copartners doing business under the name of MacDonald Truck and Manufacturing Company, as sole owners, and that plaintiffs and defendant entered into an agreement in 1934 whereby defendant was to act as managing trustee of the business, advance money thereto, and receive for his services $300 per month. For the purpose of security plaintiffs' assets were assigned to defendant. It then alleges that prior to September 2, 1944, all indebtedness owing to defendant on account of loans and salary were paid, and that plaintiffs gave defendant notice that they were exercising their right to take over the entire management and demanded that he turn over to them all assets and render a statement of all transactions conducted by him as managing trustee. The complaint further alleges that the demands were not complied with and that defendant is conducting the business in a manner that is not conducive to its best interests. The complaint alleges generally acts performed by defendant upholding the previous allegation. Plaintiffs prayed for an order restraining defendant from further participating in the business. A temporary restraining order was issued.

Defendant's answer, filed September 29, 1944, not only referred to the allegations of the plaintiffs' complaint—denying that all indebtedness owing to him had been paid, but set forth the following history of the parties' business relations: ". . . during the year 1932 defendant Rosenfeld loaned to plaintiffs herein small sums of money; that plaintiffs were then operating under the name of MacDonald Motors, Inc., but failed in business and were adjudged bankrupt in the year 1933. Prior to said bankruptcy plaintiffs had borrowed about $2200.00 from the Advance Company and had given . . . a chattel mortgage . . . defendant did buy said mortgage from said Advance Company . . . Thereafter all of the right, title and interest of said MacDonald Motors, Inc. was sold by the Trustee in Bankruptcy thereof and was purchased by one Richard F. Guggenheim . . . said Guggenheim in connection with plaintiffs and Tevis Jacobs, started the business under the name of MacDonald Truck & Manufacturing Co. . . . Plaintiffs and said Guggenheim and Jacobs then stated and represented to defendant Rosenfeld that said Guggenheim and Jacobs could no longer provide any additional money for said business . . . and requested defendant . . . to purchase said machinery and other assets . . . That in

this situation of the business, the agreement dated May 29, 1934, . . . was executed and defendant Rosenfeld started the operation of said business as his own and granted to plaintiffs the right to acquire an interest therein as specified in . . . [the 1934 agreement]." The answer further alleged: "The condition of said business continued unprofitable until about January 31, 1936, at which time said business owed to defendant Rosenfeld for money advanced, salary which he had not drawn and interest on advances, the total sum of which was about $18,000.00, at which time the agreement of January 31, 1936, which is attached hereto as 'Exhibit B.' was executed . . . That more recently said business has operated at a profit and defendant Rosenfeld has drawn therefrom all salaries due to him up to August 31, 1944, almost all sums advanced by him for the operation of said business and interest thereon, and $15,000.00 profit, but has not received any portion of the 60% of the profit of said business to which he is entitled by the terms of the agreement of January 31, 1936, which is 'Exhibit B' attached hereto." By defendant's amendment and supplement to his answer, he alleged that a partial audit had been made of the business which showed that he had not withdrawn any portion of said $15,000.

At the trial the agreement dated May 29, 1934, which was referred to in the pleadings heretofore set forth, was admitted. Certain correspondence between the parties which was produced at the trial will be related herein to show the relationship of the parties.

On December 15, 1935, defendant sent the following communication: "Messrs. Richard F. Guggenheim, W. W. MacDonald & John R. Pomfret, The MacDonald Truck & Mfg. Co., San Francisco, Cal. Gentlemen: This will refer to the agreement under which I have been financing this organization and our various talks and my expressions of dissatisfaction. No need to list them all, such as the Dock Truck orders patents, the greater indebtedness, the ownership of the Essex car, etc., as both Messrs. Guggenheim and Mr. Tevis Jacobs have acknowledged to me that I have found matters considerably different from what was represented to me to get me in here, and I have given you notice time and again and do hereby that I would like to sell out, and, while I do not wish to be abrupt, I will give you much more than ten days time in which to pay me or consider that the business has fully reverted to me and that I shall sell it. Here's the rub with

me,—I find that, through Mr. Richard F. Guggenheim not putting in the time he agreed to here at your office, I have been compelled to spend more time and put in more money than at first anticipated and as Mr. Henry Block wisely puts an old expression I cannot be true to two masters at once; I will have to either give up being with you or give up my work at John Rosenfeld's Sons, which is more secure and takes less of my time than I have given you. Because of Dick's desertion and you other two gentlemen living down the Peninsula, I have put in more hours than expected with you. As stated above, I will not be harsh or abrupt, and am open for a proposition where I will be encouraged to continue the management and financing, something along the following lines, that until I am paid in full, salary and interest, I to draw the greater part of the Net Profits, and if I remain over a period of years after I have been paid off with interest the table will be reversed so that you will get the greater share and I the lesser but that I will always have control until I am ready to sell out. Unless I get a proposition that I consider equable I will sell the business out within the next 30 to 40 days. I cannot afford to continue otherwise. The agreement would have to be signed by all four of you as I understand Mr. Jacobs has some interest in the way of money loaned. Please bear in mind that while I only purchased the complete mortgage from the Advance Company in November, '32 to save you from losing your machinery, I had previous to that time advanced some money in 1932, and put in considerable time and some money before May 1934,—none of which has been as yet made good to me. Meanwhile, I wish you all a Very Merry Xmas and a Happy and Prosperous New Year. Yours very truly, Max L. Rosenfeld.''

Subsequently a communication dated January 31, 1936, was directed to defendant and signed by the parties interested in the 1934 agreement. It reads: ''Mr. Max L. Rosenfeld . . . Referring to the agreement dated May 29, 1934, signed by Richard F. Guggenheim, W. W .MacDonald, John R. Pomfret and yourself; we fully appreciate and agree that you have done all and more than was expected of you under that agreement. We are appreciative of the fact that you have put in more time and a great deal more money than was anticipated to be necessary, and that but for your help (financial and otherwise) the business . . . would have failed long ago. We have carefully read the financial statement

of the business, as of December 31, 1935, which has been prepared by Miss F. M. Buie. It is correct and we approve the same; we also approve of all of your actions in connection with the business, and we agree that you shall continue to handle the business, as you have, under the above mentioned agreement as long as you may see fit. Richard F. Guggenheim and Tevis Jacobs have sold all their interests in said business and all property connected therewith to W. W. MacDonald and have accepted his promissory note for $1,700.00 in full payment therefor. So far as you are concerned, the title to said interest has passed to Mr. MacDonald, whether he pays the note or not. At any time you believe it to be for the best interest of the business, you may incorporate it, and you shall have free reign to handle the stock as you see fit. You are to have complete control of the business, until such time as you sell out. We hereby agree that you have our irrevocable consent to sell the entire business at any time and at any price you see fit. We agree that until you shall have received a profit of $15,000.00 over and above all salary and interest that you may pay yourself, under the present agreement, the net profits of the business shall be divided as follows: sixty (60%) per cent thereof to yourself, your heirs or assigns, and forty (40%) per cent thereof to W. W. MacDonald, he to take care of the other signors hereto as per agreement among ourselves. After you have been paid in full for all money advanced by you, all salary, interest, the $15,000. profit and the 60% net operating profits, then the profits of the business shall be divided in the ratio of thirty (30%) per cent to you or your heirs or assigns and the balance to W. W. MacDonald, to dispose of as we may agree among ourselves . . . RICHARD F. GUGGENHEIM W. W. MACDONALD JOHN R. POMFRET TEVIS JACOBS.''

The following day defendant sent the following communication: ''In accepting to continue here under the agreement of January 31, 1936, signed by all four of you gentlemen who got me into this business and who have urged me to remain, I am doing so only with the following understanding: When I first came, it was understood I was only to put in a few hours per day, and you knew I had other interests and had properties to look out for for my family and also that I was (and still am and have been for a number of years) President of the Cirac Automatic Reverse Control Company, for the manufacture of which I paid MacDonald Motors a

goodly sum several years ago, and as I have considerable money invested there, it must be understood that my work for all of the above will not in any way at any future time jeopardize my rights to full participation in the profits of the MacDonald Truck & Mfg. Co., as outlined in the agreement of January 31, 1936 and signed by all four of you gentlemen . . . until I sell out or am paid off in full as per new agreement mentioned at the top of this letter, I am to have full and free use of the office for my own personal use and for Shaflock, and only with this understanding can I afford to continue on here. It will be a convenience all round, as it will save my running back and forth between offices across town . . . Max L. Rosenfeld, Manager, MacDonald Truck & Mfg. Co.''

The primary issue involved the ownership and control of the business. The genuineness and due execution of the 1934 agreement was admitted by the pleadings. Whether the parties continued to operate under the 1934 agreement, or whether the conditions and relationship as outlined in the communications exchanged during the latter period of 1935 and the first part of 1936, particularly the letter of January 31, 1936, controlled the operation of the business and the rights of the parties after that date were questions to be determined by the trial court. The evidence is voluminous on these questions. It would serve little if any enlightening purpose to repeat all of the evidence on this appeal. Evidence concerning a meeting of February 27, 1936, of the board of directors of the Cirac Automatic Reverse Control Company was introduced. Three of the directors testified that in MacDonald's presence, defendant had showed the group the letter of January 31, 1936, as establishing his control of the MacDonald company. MacDonald, however, denied being present at such meeting. This meeting of February 27, 1936, according to evidence introduced by defendant, gave rise to a letter dated March 11, 1936, which was introduced by defendant when his motion to reopen the case was granted. Defendant sought by this letter to answer plaintiffs' argument to the effect that the letter of January 31, 1936, was wholly without consideration, and that it was uncertain and indefinite. The March 11, 1936, letter reads as follows (Bill and Jack refer to MacDonald and Pomfret respectively) : ''Messrs. W. W. MacDonald & John R. Pomfret, The MacDonald Truck & Mfg. Co., San Francisco, Cal., Dear Bill and Jack: I had

Mr. Garrett McEnerny's Office go over the Certified Copy of the minutes of the Special Meeting of the Cirac Automatic Reverse Control Co. of Feb. 27. They have now passed on each of our contracts of this year, yours to me of Jan. 31 and the Cirac A.R.C. Co's as above. In each case they asked as did Major French when we were at his office on Feb. 27th, 'What is the consideration in the contract.' As you know, Bill, I satisfied Major French that the consideration for your giving me the new Agreement dated Jan. 31 last was my promise to finance the Company for at least two years longer, and that I made the same promise to the Directors of the Cirac A.R.C. Co. that in consideration of their giving the MacDonald Truck & Mfg. Co. the deal as per your letter to them of Dec. 9, '35, as quoted in the Certified Copy of the Meetings' Minutes now signed by Leon French, that I will finance that Company also for two years from date. You'll recall Bill that the Major laughingly said 'Well, our Company gets the worst of it by 27 days' so I said 'To make it all right' I'll agree to finance both Companies for two years from March 31st, that is up to and including March 31, 1938. The Major then said that that would be consideration enough for each contract and we all agreed. You two gentlemen have freely stated your entire satisfaction with both of the above deals, but I feel it proper for your sakes in the event of my passing on that I put in writing here and now my verbal agreements with you as follows: First, that if Shaflock is put over as the result of our proposed trip East, Bill, or at any time within the two years as above, I will waive all interest on your entire indebtedness to me. Second, if the MacDonald Truck & Mfg. Co. is sold out, unless we get $80,000. (or better) I will waive all right to the $15,000 profit as mentioned in the new Agreement. But, if no sale is made of Shaflock or of the MacDonald Truck & Mfg. Co. so that I remain with you as under the new contract beyond five years from the date of my start with you, say to be liberal if I am still in this same capacity and you are still indebted to me for any large amount beyond the year say 1939, I will be entitled to interest as now being charged (7%) seven Percent Per Annum, and also interest on any sums due me for salary to be compounded each year, because, as we have agreed this would be only fair because if you had to borrow from a bank to pay me monthly my salary the interest charges by the Bank would be on each sum borrowed each month. I would also, in such event, be

free to take the entire $15,000 profit when the Company has paid me in full principal and interest due but not until the Company has sufficient in its own bank account so that the $15,000 would not force them to borrow again. In other words, I will not pay myself any part of the $15,000 within five years from date, until it can be taken without in any way greatly depleting the Company's Bank Account, and it will be at my discretion as to when I shall take it after it is earned, as I am trying to build up your credit standing, which was Nil until after I came in to finance you. While we have talked this over fully, I feel it proper to place a c.c. of this in my Safe Deposit Box with the Certified Copy of the Cirac Automatic Reverse Control Co's Minutes of Feb. 27th, '36, as signed by Leon French. The key to my box, as you both know, is in the middle drawer of my desk. All of the above for your protection. Yours very truly, MAX L. ROSENFELD.'' Plaintiffs contend that the above quoted letter of March 11, 1936, is a fraud and was written in 1944 after the first submission of the case. This problem was clearly a question of fact which the trial court decided.

Plaintiffs introduced evidence to the effect that defendant did not enforce the terms of the January 31, 1936 letter. They showed that defendant caused no account of plaintiffs' liability to defendant under said terms to be set up on the company's books. Evidence was also introduced relative to defendant's practice of filing fiduciary informative returns allocating 100 per cent of the profits to plaintiffs, with plaintiffs filing returns, respectively, for 50 per cent of the profits each as copartners. On March 2, 1938, defendant wrote the following letter to the bookkeeper: ''Happening to pass the Federal Building before 4:00 p. m. I called on Mr. Sutherland and found him a very fine gentleman. His opinion is still the same, but he said there was no objection to my putting it in as MacDonald and Pomfret being partners (with myself as manager & trustee). He said when the accountants come around to check and if they decide the other way the money will be given back to MacDonald and Pomfret and then the only penalty will be interest. I prefer to do it this way because my own statement is already made up and because it is actually, morally, the business of MacDonald and Pomfret, simply hypothecated to me. There was no money paid by me to Messrs. Guggenheim, Pomfret and MacDonald, to justify the word 'sale' in that agreement: No money passed from me

to them in payment for the business. The word was used merely to circumvent any creditors of MacDonald and Pomfret stepping in, as I was taking in trust what had been taken over in bankruptcy by Guggenheim and Jacobs. I believe that a lawyer or a court (if it was worthwhile to take it there) would agree with my claim. Messrs. Jacobs, Guggenheim, MacDonald and Pomfret, as well as myself could testify to this. Therefore, we will make our returns as originally intended and you agreed would be the best way for MacDonald and Pomfret as partners, and I will advance them the money, as I have heretofore. I will have to take notes from them with the agreement that in the event the government pays this money back then they will immediately pay me, because I do not want to pay twice. Very sincerely yours, Max L. Rosenfeld.''

In an attempt to show that the plaintiffs knew that they were working under the terms embodied in the letter of January 31, 1936, defendant produced the following communications. On July 14, 1938 defendant wrote plaintiffs: ''Much as I dislike to be constantly after you, I must again express my dissatisfaction and repeat to you notice that I may wish to sell out the place. Your efforts have been far from satisfactory and the fact that you both lived on the Peninsula . . . has entailed too much work on me . . . I told you when I agreed to continue here under the newer agreement signed in January '36 by all four of you that unless the company was sold for $80,000 or more I would waive any additional payments than salary and interest and the sixty percent of the Net unless I remained over five years after the signing of that agreement, although at that date, Jan. 31, '36 I had already served you full time almost two years but actually had been helping you financially since the summer or early fall of '32. Carrying you has been not only a burden but thus far a great risk. But for me, you would have no lift truck business and but for my financial help this organization as you know would have been sold out long ago . . . if I remain and continue to manage and finance this company, I will expect better teamwork and when there is a profit expect to take my payments as per Agreement dated January 31, 1936, which was signed by you two gentlemen as well as Richard F. Guggenheim and Tevis Jacobs, and because of which I have continued here thus far. Because I will require a witness to your signatures to agreement to cooperate more

properly I will make the letter as mild as I feel I can. If you can get the money to pay me out in Cash now, I will be willing to give a liberal discount if paid cash within 30 days. Again I will say I'm sorry to have to write you as above. . .''

Under date of October 28, 1938, plaintiff Pomfret wrote his attorney as follows: ''Dear Mr. Skinner: Referring to your letter to Mr. Max L. Rosenfeld, dated October 27, agreement under which we are operating with Mr. Rosenfeld is enclosed herewith. Please return same after perusal with other papers sent you with my letter of October 4th. You doubtless have forgotten that you vised this for us, before we signed it. It was signed by Richard F. Guggenheim, W. W. MacDonald, John R. Pomfret and Tevis Jacobs. [Letter of January 31, 1936] As in a previous letter, I told you we owe Mr. Rosenfeld considerable for personal loans. On all of these notes he agrees to rebate half the interest if we pay him before noon of November 1, 1938. Since reading your letter he had told me that he would step out of the picture entirely and wipe out all of our indebtedness to him for the sum of $62,500 net cash, paid to him on or before November 5 next,—we in turn to agree to assign to him 50 percent of what returns we received from Shaflock, as he has furnished his own cars and done all demonstrating. As you know, Mr. Rosenfeld has been our best friend for a number of years, and during all these hard times Mr. MacDonald and I have drawn our salaries weekly, where Mr. Rosenfeld has taken neither bonus or salary. He will, of course, require that whoever buys him out guarantee him against loss because of the guarantees of accounts which he has personally given. We, for our part, would not want Mr. Rosenfeld to step out of the picture now under any circumstances, unless the party you have in view is amply able to finance us for the future.''

Defendant testified that a field sales manager of General Motors was shown the letter of January 31, 1936, and that he ''had Mr. MacDonald O.K. that that was the agreement under which we were working.'' Defendant also testified that on another occasion: ''I had Mr. MacDonald and Mr. Allen (another purchaser) and myself together, and I said to Mr. MacDonald, handing to Mr. Allen . . . [the letter of January 31, 1936], 'Is this your signature, and will you tell Mr. Allen this is the agreement under which we are operating?' . . . And he said 'It is.' But for that Mr. Allen would not have considered it.''

The parties' understanding of the terms under which they were working is further shown by the following letter dated December 18, 1939: "This will refer to the Exclusive Sales Agreement which we all three signed with Mr. H. O. Harrison, as of December 14, 1939, and most especially to the option to purchase, granted to him therein as per paragraphs starting on page 4 and ending on page 5 of said agreement. I understand of course that as he is your particular friend you will look to him to take care of you two with good pay and an interest, should he avail of this option, and that I will be in no way liable. However I am willing to make conditions as follows: If he should avail of the option and pay me off quickly, I will not keep the entire $15,000 profit, should there be so much. On the other hand, inasmuch as you have not installed six Shaflocks within the time limit set in the agreement as per minutes of the meeting of the Cirac Automatic Reverse Control Co. on February 27, 1936 (at which you were present, Bill) I will expect, if I am paid off, that the Cirac Automatic Reverse Control Co. could, at their option, cancel your free shopright and your Twenty-five percent interest in the net, as it would mean my having to move to another office and that would be an added expense and inconvenience. Furthermore, if Mr. Harrison does not avail of his option before its expiry, and if I am called upon to furnish further sums to carry the company I will expect to get the entire $15,000 (if I am here another year or longer) and of course that the interest will be charged on all unpaid balances at the end of each month and year as at present. I am reminding you of this now, as, if they do not pay us promptly, I may have to carry the company for even much larger sums of money than up to date and, as you know, this has become quite a burden and is much more than was contemplated when you signed the agreement of Jan. 31, 1936."

With the war, the business profited. By August 31, 1944, defendant had received approximately $36,000 as his salary from 1934 to that date. Since that date, however, he received no salary. Prior to that date, plaintiffs' salaries were raised, Pomfret getting $85 a week and MacDonald getting $95 a week. According to a statement issued bearing the date August 31, 1944, plaintiffs had paid up all amounts due defendant on the books of the business. This statement supports plaintiffs' allegation that defendant had been repaid. However, this statement did not consider such factors as lack of interest

being charged prior to 1940 on defendant's salary, as well as plaintiffs' liability to defendant for part of the profits under the 1936 contract.

A report dated September 30, 1944, showed that $3,319.72 was due defendant from plaintiffs. At about that date defendant deposited $5,000 to the company's account to cover outstanding expenses. Defendant also made advances to plaintiffs for taxes.

In the interlocutory decree the following appears: "The Court finds that, as of August 31, 1944, the profits of said business were $72,255.23, no portion of which have been received by said Rosenfeld.

"The Court further finds that, as of August 31, 1944, (after deducting said sum of $15,000.00, in accordance with said stipulation of said Rosenfeld) plaintiffs were and still are indebted to defendant in the sum of $48,541.04. . . .

"That August 31, 1944, was the last accounting date between plaintiffs and defendant and since that time plaintiffs have been operating said business of MacDonald Truck & Manufacturing Co. by permission of the temporary injunction which was issued herein, and defendant is entitled to an accounting of all profits received on account of said business and not shown upon said August 31, 1944 account, and said defendant is entitled to a judgment herein for a salary at the rate of $300.00 per month from August 31, 1944, until he is reinstated in possession and control of all of the assets and property of said business, which salary shall continue hereafter as long as he shall act as Manager of said business, and he is also entitled to a Judgment herein, against plaintiffs, for his interest in the profits of said business since August 31, 1944, at the rates specified in said agreement of January 31, 1936, and said defendant is entitled to be reinstated as Manager of said business and placed in possession of all the assets and property thereof." The conclusions of law attached to the interlocutory decree recite that "plaintiffs paid Federal and State Income Taxes on all of said profits." The court directed the referee "to report to the Court the amount of profits which have accrued to said business for the years 1944 and 1945 and on which plaintiffs have paid Federal and State income taxes, and to recommend to this Court the proper apportionment of taxes on all of said profits."

The findings upon which the final judgment was based, referring to the 1934 and the 1936 contracts, set forth that "both

contracts are valid and binding on both plaintiffs and defendant and are both supported by good, valuable and sufficient consideration.'' The court also found that defendant was entitled to receive a salary of $300 a month and entitled to reinstatement as manager of the business also; ''That defendant is entitled to receive sixty (60%) per cent upon $21018.85 of the net profits of said business for the year 1943 and thereby there shall have accrued total net profits in said business sufficient so that sixty (60%) per cent thereof shall amount to $15,000.00 thereof for defendant; and the Court finds that defendant is entitled to receive 30% upon $40,744.64 of the net profits of said business for 1943 and after December 31, 1943 defendant shall continue to receive 30% of the net profits of said business. . . . Defendant is also entitled to receive from plaintiffs thirty (30%) per cent of the net profits of said business, commencing as of January 1, 1946, in addition to the amounts awarded to defendant by the Judgment herein.'' The report of the referee was accepted and judgment entered in favor of defendant in the sum of $42,709.57 with legal rate of interest and costs.

It is appropriate that it should be noted that it is not necessary that this court consider the mathematical computations involved in the preceding findings and conclusions and judgment. It was stipulated at the oral argument that, without waiving plaintiffs' contentions as to the interpretation to be placed upon the documents introduced in evidence or the claimed inferences that should be drawn therefrom or from the testimony offered, if the findings of fact and the conclusions of law are otherwise correct, the *amount* found to be due defendant is correct. In the interlocutory decree a referee was appointed to report the amounts accrued to the business for the years 1944 and 1945, and to recommend a proper apportionment of taxes on all profits for the years 1937 and 1941 to 1945 inclusive. This duty was performed by the referee, and, based thereon, a report made and $30,734.13 deducted from the amount decreed to be due, namely $73,443.70. Defendant argues that the action of the trial court in this respect was unjust to him. There may be considerable apprehension by both sides as to future action by income tax authorities. No control thereof is vested in this court in the present proceedings to determine income tax obligations, including interest and penalties that may be decided to have been due by the company or its members at the

time this judgment was entered. Assuming that the trial court was warranted in determining the excessive income taxes paid by plaintiffs, but only upon that assumption, at the oral argument it was stipulated that $30,734.13 was the correct amount. As previously noted the amount of the judgment entered by the court was $42,709.57.

The validity of the 1934 contract is admitted. The documentary evidence introduced, previously referred to, is sufficient to support the finding that during the latter part of 1935 and in 1936, plaintiffs induced defendant Rosenfeld for a good and valuable consideration to continue to make further and additional advances of money to operate the business, and that he continued to operate such business until he was enjoined by an order of the superior court from exercising any control thereof. Having found that under the contracts the defendant was entitled to the exclusive management of the business, the court also correctly found that defendant was entitled to an accounting of all profits during the period the temporary injunction was enforced.

The court further found, upon evidence from which a reasonable inference could be drawn, that it was true that "prior to September 2, 1944, plaintiffs did suggest to defendant that he do certain things in connection with the management of said business, and which suggestions, after being examined by said Rosenfeld, were disapproved by him, but that all of his acts in so disapproving the suggestions of plaintiffs, were in accordance with his best judgment for the successful operation of said business." There is also evidence "that defendant has not drawn or received the $15,000 profit provided by the agreement of January 31, 1936 . . . On December 20, 1945, in open Court, defendant Rosenfeld voluntarily stipulated that the sum of $15,000.00 should be deducted from the sums due to him by plaintiffs, but reserved the right to said sixty (60%) per cent of the profits of said business until such time as he shall have been paid all sums due to him for money loaned to said business, for salary at $200.00 per month from and including September 1, 1944, and for interest at the rate of six (6%) per cent per annum on both said unpaid loans and salary. After all said sums are paid to said Rosenfeld, he shall be entitled to continue to manage said business and receive said salary of $300.00 per month and shall be entitled to receive thirty (30%) per cent of the profits of said business."

It is contended by plaintiffs that the findings are inadequate to cover all of the issues raised by the pleadings. Attention is called to the fact that the rights of the parties are not specified by the terms of the judgment. The only point worthy of consideration is that the judgment sets no *time* limit on defendant's power to manage the business. None is specified in the 1936 agreement. In this respect no direct finding as to a definite time limit was necessary. In reference to the ownership of the business, the judgment leaves the legal title in the defendant only as security. Defendant is to be repaid the amount of his loans plus interest and salary.

The findings and the judgment should be construed in a manner that will tend to uphold the evident intention of the fact finder. In this case it must be assumed that the findings were served and that that phase of the proceedings was disposed of in accordance with the provisions of Code of Civil Procedure, section 634. On the motion for new trial the court could have changed the findings or modified the judgment and if necessary could have reopened the case to settle a claimed inadequate finding. (Code Civ. Proc., § 662.) This court could have invoked the provisions of section 956a of the same code and made an additional finding if that appeared necessary.

When the findings and conclusions of law are read as a whole it must be determined that defendant or his heirs and assigns may retain possession and control the management of the business under the designated salary "so long as he [defendant or his heirs or assigns] shall see fit," meaning until the terms of the contract are fulfilled. It must be admitted that whether the duties of the parties as outlined in the contracts are in truth and in fact performed, may lead to litigation. The trial court fixed the present legal responsibilities of the parties—future disputes based upon factual conditions that may or may not arise are beyond the realm of present determination.

█ Plaintiffs correctly state the rule that a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage over him by adverse pressure of any kind. (Civ. Code, §§ 2228, 2229, 2231, 2234, 2235.) █ The evidence supports the view that defendant was granted "a power coupled with an interest" in that he was given the management of the business as security for the loans he had made. (See *Lane Mortgage Co.* v. *Crenshaw,*

93 Cal.App. 411, 428-429 [269 P. 672] ; *Hunt* v. *Rousmanier,* 8 Wheat. (U.S.) 174 [5 L.Ed. 589] (Marshall, Ch.J.) ; 33 Words and Phrases, 149-155.) *Neel* v. *Barnard,* 24 Cal.2d 406 [150 P.2d 177], cited by plaintiffs, turns upon the fact that there was evidence in that case to support the trial court's conclusion that defendant was a trustee rather than a mortgagee in possession. In the present case plaintiffs refer to one letter written by defendant upon which such an inference might be drawn, but when all the correspondence is read the statements in the one letter could reasonably appear to the trial court as insignificant. Under the circumstances this court is unable to declare that the trial court was not correct. (*Holland-Meisell Co.* v. *Kelly,* 37 Cal.App. 610 [174 P. 698].)

■ Plaintiffs argue that the 1936 agreement is wholly without consideration as there is no promise to forbear selling the business; that if it is a valid agreement it rather enlarges defendant's right to foreclose as outlined in the 1934 agreement. Consideration is a promise which is bargained for and culminates in an agreement. (Restatement of the Law, Contracts, § 75.) Reliance must be based upon the promise. (*Bard* v. *Kent,* 19 Cal.2d 449 [122 P.2d 8, 139 A.L.R. 1032].) "The cases in this state, as elsewhere (74 A.L.R. 301), hold that the promise to forbear may be implied." (*Wine Packing Corp. of Cal.* v. *Voss,* 37 Cal.App.2d 528, 538 [100 P.2d 325].) As noted before, all of the evidence pertaining to a disputed subject, including documents and testimony, must be weighed and determined. The trial court found that the 1936 contract was a valid and binding obligation on each party and was "supported by good, valuable and sufficient consideration." There is evidence to uphold this finding.

■ The present rule appears to be that the final construction of a contract, where there is no substantial conflict in the evidence, may be resolved by a reviewing court in accordance with the applicable principles of law. (*Estate of Platt,* 21 Cal.2d 343 [131 P.2d 825].) ■ In this case there is no conflict as to the existence of the letters except the letter of March 11, 1936, which plaintiffs claim is a fraud, but which the trial court determined to be genuine. There is a dispute relative to the inferences that may be drawn from the contents of the letter of January 31, 1936, and from the actions of the parties in the succeeding years. Civil Code, section 1584, provides: "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a

proposal, is an acceptance of the proposal." Here there is evidence that the parties operated under the agreements for at least eight years. The much discussed communication of January 31, 1936 permits defendant "to sell the entire business at any time." The sentence immediately preceding refers to defendant's right "to handle the stock," if incorporated, "for the best interest of the business." Defendant was to be permitted to "continue to handle the business, as you have, under the above mentioned agreement . . ." The first paragraph of the agreement refers to the previous "agreement dated May 29, 1934." In the 1934 agreement defendant, in consideration of an assignment and transfer of the business property, agreed to pay certain bills and "the operating expenses of said business." This court upon the terms set forth in the communication quoted above determines that the parties entered into a security transaction in the form of a contract with a good and sufficient consideration, and that such contract is a legally binding contract upon the parties thereto.

 It has been determined that the letter of January 31, 1936, is a valid contract. Nevertheless plaintiffs contend that it is unjust, inequitable, indefinite, uncertain and cannot be specifically enforced. Plaintiffs attempt to treat defendant merely as a creditor. However, the evidence shows that he was the manager of the business and as such entitled to the benefits that might accrue under the security contracts. Plaintiffs understood the meaning of the word "profits" as exemplified by the use of the word in their tax reports. Prior to the commencement of this action in equity by plaintiffs, defendant was in possession, and the 1936 agreement authorizes him to stay in possession—he has not asked for specific performance, but asks to remain in possession. As to the sufficiency of the contract, the parties have operated under its provisions for many years and found no difficulty in understanding them. "The fact that the contract, although valid, is not susceptible of being made the subject of a decree of specific performance in equity does not leave the parties without remedy or deprive the trial court of its power to proceed with a disposition of the entire controversy." (*Lyon v. Goss*, 19 Cal.2d 659, 675 [123 P.2d 11].)

 It is also urged that defendant is estopped from asserting any rights under the 1936 agreement upon the theory that he had abandoned all rights under the terms of the 1936

agreement and in particular that he caused no entries to be made crediting himself with 60 per cent of the profits, and that his tax returns did not attribute any net profits of the business to himself. The evidence is sufficient to support the trial court's implied finding that defendant' is not estopped from asserting rights under the agreement. The evidence indicates that plaintiffs were aware of the terms of the 1936 agreement, but, as a matter of protecting their *claim*, they filed returns on the entire profits. Since plaintiffs continued to receive benefits from the 1936 agreement in the form of defendant's continued financing and management, the evidence supports the conclusion that plaintiffs are estopped from denying defendant's rights under the 1936 agreement —to at least the same extent that the evidence supports the conclusion reached by plaintiffs.

The trial court deducted from the determined amount of plaintiffs' indebtedness to defendant Rosenfeld $30,734.13, representing income taxes paid by plaintiffs in excess of the amount they would have paid if they had acknowledged that defendant had an interest in the business profits. It is plaintiffs' theory that this deduction directed by the court is an attempt to avoid the application of the doctrine of estoppel. The facts indicate that defendant could not consistently assert the terms of the letter of January 31, 1936, and have plaintiffs pay taxes on profits based on their ownership of the entire business. Defendant's acquiescence in this method of payment of taxes may have been based upon a desire to decrease the total tax paid and not as an act on his part of deliberately misleading plaintiffs. The trier of the facts would be justified in concluding that defendant Rosenfeld is not estopped from asserting any rights under the 1936 agreement.

Defendant cross-appealed ''From that portion of said Judgment which determines and decides that the Income Taxes paid by the plaintiffs to the Federal and State Governments on the percentage of the profits of said MacDonald Truck & Manufacturing Co., to which defendant is entitled, be deducted from the sums due plaintiffs to defendant.'' Other grounds of appeal are set forth which have not been specifically referred to in defendant's brief on the cross appeal or disposed of on the main appeal by plaintiffs. The idea of charging defendant Rosenfeld with the income taxes which plaintiffs paid on the share of the profits found to be defendant's originated with the trial court. The idea did not meet with

240 of 240240

the approval of either side, but the trial judge was correct. In the prayer of plaintiffs' complaint is found the following: "That said defendant Max L. Rosenfeld render a full, true and correct itemized account of all of his transactions in the conduct and management of said business while acting as such managing trustee involving the receipt and disbursement by him of the funds of said business." It appeared under the terms of the 1936 agreement, which defendant sought to uphold, that defendant as manager, and plaintiffs as partners, should dispose of the profits in accordance with the terms of the contract. The $30,734.13 represented part of the profits, and therefore, as money paid out by the partners, was deductible from the full amount originally computed as due defendant.

The gist of defendant's cross-appeal is that if $30,734.13 is deducted from the amounts owing him, he will be in effect paying taxes twice for the same years. This conclusion is based upon the fact that as a result of the judgment awarding him a portion of the profits as per the 1936 agreement, he will have to pay additional taxes for past years. On the other hand, plaintiffs not only will in effect be receiving a refund from defendant for the taxes they paid, but will be entitled to a refund from the government. The trial court was not interested in the "form" used by the respective parties in making returns, or in giving "information" to the taxing agencies. It was simply a matter of an allowable deduction. The penalties, if any, that may be involved, or the failure of the respective parties to claim refunds of all or a portion of the taxes, or the filing of false returns, if such occurred, are matters with which this court is not concerned. Such matters may be left to the federal or state taxing agencies to be adjusted and corrected if necessary in a proper tribunal.

The judgment is affirmed in its entirety, each party to bear 50 per cent of the costs of each appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied February 11, 1948, and plaintiffs' and appellants' petition for a hearing by the Supreme Court was denied March 11, 1948.