In re Richard H. and Nancy R. DONCKERS, Debtors.

H. Collins Haynes, Plaintiff,

v.

Richard H. and Nancy R. Donckers, Defendants.

Bankruptcy No. 5:05–bk–75192.
Adversary No. 5:06–ap–07042.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Jan. 19, 2007.

Jason N. Bramlett, Friday, Eldredge & Clark, LLP, Fayetteville, AR, for Plaintiff.

J. Christopher Harris, Keith, Miller, Butler & Webb, Rogers, AR, for Debtors.

## ORDER

RICHARD D. TAYLOR, Bankruptcy Judge.

Before the Court is the Complaint to Determine Validity, Priority, and Extent of Lien, to Obtain Declaratory Relief, and

to Obtain Relief From the Automatic Stay [the Complaint] filed by the plaintiff, H. Collins Haynes [Haynes]. The debtors filed an Answer and Objection to Claim [the Answer]. Trial was held on October 24, 2006. The parties appeared personally and through their attorneys. Haynes seeks declaratory relief based on the assertion that a mortgage he holds as assignee collateralizes $586,219.03 in debt representing the last of three promissory notes successively executed or guaranteed by Haynes and the debtors. The debtors contend that the mortgage collateralized solely the initial note (a promissory note for $150,000.00) or, alternatively, an amount not greater than the initial note amount regardless of its inclusion in the third note, or that the mortgage should have been released when the third note paid off the initial note. At the conclusion of trial, the Court took the matter under advisement.

For the reasons stated below, the Complaint is granted in part and denied in part. The Court finds that Haynes has a valid claim in the amount of $368,109.52, of which $150,000.00 is an allowed secured claim (and upon which costs, interest, and attorney fees may accrue). The balance of $218,109.52 is an allowed unsecured claim.[1]

## Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (I), and (K). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## Background Facts

Separate debtor Richard Donckers [Donckers] and Haynes were members of Market Foods Ltd., LLC [Market Foods], an entity formed to operate boutique grocery stores, principally in northwest Arkansas. In furtherance of that effort, Market Foods cultivated a lending relationship with Community Bank of North Arkansas, later Chambers Bank of North Arkansas [collectively Chambers Bank or the bank]. This relationship involved a number of loans, three of which are pertinent to the contentions between these parties.[2] The pertinent notes are referred to as Note One, Note Two, and Note Three.

### Note One

Market Foods executed Note One, a promissory note in the principal amount of $150,000.00, on August 31, 2004. Haynes and Donckers signed Note One, which was scheduled to mature on October 5, 2004, as members of Market Foods. Both the debtors and Haynes executed commercial guaranties in favor of Chambers Bank.[3] The Chambers Bank Boarding Data Sheet under the heading of "Loan Class" charac-

---

1. Haynes's allowed but partially secured claim consists of the full indebtedness represented by a $150,000.00 promissory note dated August 31, 2004, plus one half of the difference between $150,000.00 and $586,219.03. The balance is diminished by one-half as is required by 11 U.S.C. § 509(b)(1)(A) concerning contribution between joint obligors. The full amount of the initial $150,000.00 note is not subject to contribution between the joint guarantors as the mortgaged collateral secured the initial note itself (defined as Note One below), not merely the debtors' guaranties. Accordingly, both

the lending bank (and Haynes, its assignee) as well as any other co-guarantor, including Haynes, had a contractual expectation that the guaranteed debt would be diminished by the full application of the collateral directly securing Note One.

2. A fourth note will be discussed below as it is historically significant to the debtors' position. *See infra* note 5.

3. There does not appear to be any dispute concerning whether the guaranties relate to the three promissory notes in question.

terizes the transaction as a "New Loan." (Defs.' Ex. I.)

Also on August 31, 2004, both debtors personally executed a Mortgage [the Mortgage] in favor of Chambers Bank. The described real property consists of the debtors' homestead valued at approximately $800,000.00. The Mortgage collateralized Note One itself, not the contingent performance of the debtors' guaranties.

Specifically, the Mortgage defines "Note" as "the promissory note dated August 31, 2004, in the original principal amount of $150,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement." (Pls.' Ex. 3; Defs.' Ex. L.) More generically, the Mortgage also provides that it secures payment of the "Indebtedness," which is defined as "all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents...." (Pls.' Ex. 3; Defs.' Ex. L.) The term "Related Documents," while implicitly expansive, is, as defined in the Mortgage, restricted by a modifier that refers back to the defined term "Indebtedness."

### Note Two

Haynes, Donckers, and three other Market Foods members executed Note Two, a promissory note in favor of Chambers Bank dated September 30, 2004, in the original principal amount of $200,000.00. Market Foods did not execute Note Two. Note Two matured on October 15, 2004. The Disbursement Request and Authorization form, (Pls.' Ex. 5), reflected that it was a business loan specifically for working capital purposes.

### Note Three

Market Foods executed Note Three, a promissory note in favor of Chambers Bank dated November 16, 2004, in the principal amount of $573,535.00. Denoted as Loan No. 9410, it was to mature on February 15, 2005. Donckers and Haynes signed Note Three as members of Market Foods; it mirrors Note One in this regard. The Disbursement Request and Authorization form, (Pls.' Ex. 7), reflects that it was a business loan to provide short-term working capital. Part of the proceeds were used to pay off Note One and Note Two: $151,898.63 on Note One and $201,512.33 on Note Two. The balance represented additional working capital extended to Market Foods. Chambers Bank's Debit/General Ledger form characterized this credit as a "New Loan." (Pls.' Ex. 7.)

The Chambers Bank Loan Checklist under the heading "Collateral" states: "This transaction is secured by UCC Collateral." (Defs.' Ex. P.) No reference is made to the Mortgage. Additionally, the same Loan Checklist contains the following entry: "Copied From: 9139." As will be explained below, Loan No. 9139 was an earlier transaction that the debtors argue Note Three was intended to emulate. The "Copied From" language is further amplified by an Advisory Warnings to Lender reference (a category on Chambers Bank's standard form) regarding its historical antecedents, which states: "This transaction was created based upon a copy of another transaction." (Defs.' Ex. P.) Further, the Loan Documents list outlined in the Loan Checklist refer to a number of documents, from the Loan Checklist to a Commercial Security Agreement (also dated November 16, 2004, and defined below), inclusive of the guaranties and other documents normally related to a credit transaction.

908

However, the Loan Documents list contains no reference to the Mortgage.

Chambers Bank also generated a Boarding Data Sheet, (Defs.' Ex. Q), relating to Note Three. Again, it references Loan No. 9139 in the "Copied From" section. The Note Three loan purpose was "To Provide Short–Term Working Capital." The stated loan class was "New Loan." A checklist space for "1st or 2nd Mtg:" was left blank. The "Collateral Summary" section refers to the "Assignment of Contract—Jordan Creek Village Center, West Des Moines, Iowa, Lease Agreement between GGP Jordan Creek L.L.C. (Landlord) and Market Foods Limited, L.L.C. (tenant) dated January 21, 2004," which is the collateral described in the Commercial Security Agreement; no reference is made to the Mortgage. The Boarding Data Sheet reflects disbursements to "Payoff" Note One and Note Two. Under "Officer Comments," the following can be found:

Primary Source of Repayment: Contract Receivables

Secondary Source of Repayment: Business and Personal Cash Flow

Again, there is no reference to the Mortgage.

Chambers Bank also generated a Notice of Final Agreement with respect to Note Three. (Defs.' Ex. R.) The specific listing of loan documents does not include the Mortgage, but does reference the Commercial Security Agreement.

Market Foods defaulted on Note Three, which generated two demand letters. The first letter was from Chambers Bank's attorneys dated January 21, 2005. (Defs.' Ex. V.) The second demand was directly from Chambers Bank over the signature of J. Shannon White, the Senior Vice President who was the loan officer on the credit. (Defs.' Ex. W.) The letter references Market Foods's bankruptcy. Neither demand referenced any collateral.

Neither the three promissory notes or the Mortgage contain cross collateralization, all indebtedness, or future advance clauses. These type clauses were not unknown to Chambers Bank; the Commercial Security Agreement contained a cross collateralization clause, (Defs.' Ex. G), and at least one exemplar of a Chambers Bank mortgage contained a future and additional indebtedness clause. (Defs.' Ex. M.)

**Haynes's Claim**

Market Foods filed its voluntary chapter 11 petition on January 24, 2005. Market Foods later converted to a chapter 7 and cannot address its obligations under Note Three. The debtors filed their personal bankruptcy on July 16, 2005. Chambers Bank pursued its rights against Haynes based on his guaranty. On March 11, 2005, Haynes satisfied Note Three by payment to Chambers Bank of $586,219.03, which represents the original principal balance plus accrued interest through March 11, 2005. In exchange, Chambers Bank executed an assignment to Haynes conveying Note Three, the Mortgage, the debtors' personal guaranties, and the Commercial Security Agreement dated November 16, 2004, associated with tenant rebates and Note Three. (Pls.' Ex. 10.)

The debtors' schedules reflect that the value of the property subject to the Mortgage is $800,000.00, a figure well in excess of Haynes's claim. If the Mortgage and claim are valid, and if the Mortgage collateralizes the full amount of Note Three, then Haynes is fully secured pursuant to 11 U.S.C. § 506.

Haynes contends that, as Chambers Bank's assignee, he has the right to pursue the Mortgage, which he asserts fully collateralizes Note Three. Haynes's position is that Note Three represents a renewal, extension, modification, substitution, and/or consolidation of Note One, Note

Two, and the additional indebtedness extended in the context of Note Three.

### Donckers' Defense

The debtors responded to the Complaint by filing the Answer, which included an objection to Haynes's claim. The debtors denied that Haynes had a valid secured claim or mortgage lien. Although no reference is made to 11 U.S.C. § 502, the response appears to raise the issue of enforceability under § 502(b)(1).

The gravamen of the debtors' defense and claim objection is threefold. First, the debtors contend that Note Three, as a matter of law, paid off Note One and, therefore, Chambers Bank was obligated to immediately release the Mortgage. Second, the debtors assert that a representative of Chambers Bank advised them at the time Note Three was executed, the Mortgage would be released. The third argument combines and amplifies the first two. The debtors suggest that the discussions regarding the release of the Mortgage were consistent with the short term nature of Notes One and Two and the anticipated long term nature of Note Three, a transaction that was to mirror a prior credit relationship between Chambers Bank and Market Foods. In that event, the short-term credits represented by Note One and Note Two would have been replaced by long-term credit collateralized solely by the collateral described in the Commercial Security Agreement. If the debtors are correct, Haynes would simply have an unsecured claim,[4] which the debtors argue should further be diminished by one-half based upon the contribution rights incidental to a typical co-guarantor relationship.

---

4. Apparently, the collateral described in the Commercial Security Agreement is now val-

### Discussion

The debtors are only partially correct. The Mortgage is valid and enforceable and fully collateralizes the indebtedness represented by Note One, plus costs, reasonable attorney fees, and interest until paid. However, the Mortgage does not collateralize the additional indebtedness represented by Note Three, which includes both Note Two and the extension of additional debt. Note Three represents, in part, a renewal, extension, modification, consolidation, or substitution of or for Note One. The additional indebtedness represented by Note Three over and above the amount represented by Note One is not secured by the Mortgage. Neither the Mortgage or the three promissory notes contain future advance, all indebtedness, or cross collateralization clauses. Therefore, only the original indebtedness represented by Note One, in whatever subsequent form, is collateralized by the Mortgage.

Three factors support this conclusion. The first is the express language of Note One and the Mortgage. The Mortgage secures the indebtedness represented by Note One, regardless of whether it is later consolidated, renewed, extended, modified, or reemerges in a substituted form. A change in the form of the debt is "insufficient to constitute payment of a debt and discharge a mortgage." *St. Agatha Fed. Credit Union v. Ouellette*, 722 A.2d 858, 861 (Me.1998) (citing *Jones v. New York Guaranty and Indem. Co.*, 101 U.S. 622, 630, 25 L.Ed. 1030 (1879)); *Schwerin v. Shostak*, 213 Cal.App.2d 37, 42–43, 28 Cal.Rptr. 332 (1963). The parties contractually agreed in this regard.

ueless.

Second, and concomitantly, neither Note One or the Mortgage contain a future advance, all indebtedness, or cross collateralization clause that would represent a contractual agreement by the debtors that the Mortgage might serve to collateralize other or additional indebtedness.

Third, it is clear from Chambers Bank's own documents that it did not contemplate or memorialize that the Mortgage would serve as collateral for the indebtedness represented by Note Three. The bank's testimony supports this conclusion. While one officer testified that the Mortgage was considered part of the Note Three loan package, the testimony of the actual loan officer involved was more equivocal. Further, the documentation for Note Three simply does not support the first officer's testimony.[5]

■■■ The rule of law relating to mortgages and the debts they secure was stated succinctly by the Arkansas Supreme Court in 1934:

> [w]here a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate.

*Hendrickson v. Farmers' Bank & Trust,* 189 Ark. 423, 73 S.W.2d 725, 729 (1934). According to the court, the intention of the parties must be regarded, and "all the circumstances attendant upon the execution of the mortgage and the nature of the transaction itself are to be considered." *Id.* The purpose of this rule of law is "to protect the borrower against the unwarranted extension of the lien for debts which the parties might not have intended." *Union Nat'l Bank of Little Rock v. First State Bank & Trust Co. of Conway,* 16 Ark.App. 116, 697 S.W.2d 940, 942 (1985). However, the intention expressed by the language employed controls and "cannot be enlarged by any contemporaneous parol or subsequent agreement that it should secure any indebtedness other than that referred to in the mortgage." *Bank of Searcy v. Kroh,* 195 Ark. 785, 114 S.W.2d 26, 28 (1938). Absent ambiguity, the court must interpret the document in accordance with the intention of the parties expressed by language appearing in the document itself. *National Bank of East. Ark. v. General Mills, Inc.,* 283 F.2d 574, 577 (8th Cir.1960) (discussing and

---

5. That Note Three was perhaps intended to duplicate substantially an earlier transaction does not change the fact that it did represent a substitution inclusive, in part, of Note One. At trial, Donckers suggested that it was the intent of the parties that Note Three would mirror a previous Market Foods's transaction with Chambers Bank. This earlier transaction was represented by a Promissory Note in the original principal amount of $1,250,000.00 dated May 18, 2004, Loan No. 9139, with an August 18, 2004, maturity date [the Original Note]. (Defs.' Ex. F.) Market Foods is listed as the borrower, and Donckers and Haynes, as members of the LLC, executed the Original Note.

In addition to guaranties from Haynes and Donckers, the Original Note was collateralized by a May 18, 2004, security agreement on the tenant rebate originating from a Market Foods's leased location in Iowa. Chambers Bank valued the leasehold collateral at $2,500,000.00, (Defs.' Ex. E), which was sufficient to cover the Original Note. The security agreement has a cross-collateralization clause; as noted previously, the Mortgage does not. Although Note Three in many ways mirrored this earlier transaction, it does not change the fact that it did represent a substitution inclusive, in part, of Note One. Accordingly, by the express terms of Note One and the Mortgage, the collateralization survived.

adopting the trial court's conclusions relating to the interpretation of Arkansas cases).

The debtors' argument that the execution of Note Three, as a matter of law, paid off Note One, and that the bank was obligated to immediately release the Mortgage, would require the Court to find that Note Three is neither a renewal of, extension of, modification of, consolidation of, or substitution for Note One. The Court is unwilling to do so.

The debtors also argue that when Note Three was executed, affirmative representations were made that the Mortgage would be immediately released. In support of this argument, the debtors refer to a specific statement to that effect and to the supporting documentation that reflects that it was not in the bank's contemplation that Note Three would be collateralized by the Mortgage. This argument fails on the pleadings and the proof. Although six pages in length, the debtors' Answer is a bare-bones pleading: (1) it generally disputes the validity of the Mortgage lien;[6] (2) it does not contain a counterclaim; (3) it does not contain a count for fraud, misrepresentation, or breach of contract; and (4) it does not raise any colorable defenses or claims on which this Court could find for the debtors. In their Answer, the debtors "affirmatively plead that a representative from Chambers Bank told them that that particular note [Note One] was paid and that the mortgage would be released." (Answer ¶ 8.) The debtors reason that this statement would be consistent with the parties intention that the Note Three transaction would mirror the earlier Original Note transaction. However, as previously stated, the Answer contains only a factual allegation that this representation was made. No concomitant cause of action is suggested or made. This creates three significant infirmities.

First, even if the statement had been made, it is clear that Note One was not paid and continued to exist in a substituted form. Second, if the parties' intention was that the execution of Note Three paid off Note One and that the Mortgage should have been released, then that assertion should have been the subject of a counterclaim for breach of contract, fraud, estoppel, detrimental reliance, misrepresentation, or failure to release the Mortgage as required by Arkansas law. More specifically, the debtors correctly argue that there is a statutory requirement under Arkansas law that the mortgagee must acknowledge satisfaction of the amount due on a mortgage at the request of the person making satisfaction. Ark.Code Ann. § 18–40–104(a) (Supp.2005). The same statute states the appropriate cause of action if a satisfied mortgage is not acknowledged:

> (a) If any mortgagee or his or her executor, administrator, or assignee shall receive full satisfaction for the amount due on any mortgage, then at the request of the person making satisfaction, the mortgagee shall acknowledge satisfaction of the amount due on the mortgage on the margin of the record in which the mortgage is recorded.
>
> . . . .
>
> (d) If any person receiving satisfaction does not, within sixty (60) days after being requested, acknowledge satisfaction as stated in subsection (a) of this section . . ., he or she shall forfeit to the party aggrieved any sum not exceeding the amount of the mortgage money, to be recovered by a civil action in any court of competent jurisdiction.

Ark.Code Ann. § 18–40–104(d) (Supp. 2005).

---

**6.** A defense based on an exemption argument was abandoned at trial.

The Answer does not specifically or generically plead or allude to this statute. As previously indicated, by its very contractual terms the indebtedness represented by Note One survived in substituted form by virtue of the execution of Note Three. Additionally, at no time within the context of this litigation did the debtors file a compulsory counterclaim as required by Rule 7013, as being extant at the time of service that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Fed. R. Bankr.P. 7013.[7]

Third, regardless of whether any counterclaim or sufficient affirmative defense had been properly raised in the Answer, the debtors simply did not meet their burden of proof on the elements required. The evidence presented does not support a finding of fraud or misrepresentation, or a suitable basis for a statutory satisfaction demand.

For the reasons stated above, the Court finds that Haynes has a valid and allowed claim in the amount of $368,109.52, of which $150,000.00 is an allowed secured claim (and on which costs, interest, and attorney fees may accrue). The balance of $218,109.52 is an allowed unsecured claim. Haynes's allowed but partially secured claim consists of the full indebtedness represented by Note One—a $150,000.00 promissory note dated August 31, 2004—plus one half of the difference between $150,000.00 and $586,219.03.

The automatic stay is hereby terminated and lifted to allow liquidation and collection, through foreclosure, agreement, or otherwise, of the collateral described in the Mortgage only to the extent of the $150,000.00 amount described above, plus costs, interest and a reasonable attorney fee not to exceed 10% of the $150,000.00 secured amount. Before or within thirty days after liquidation of the collateral by foreclosure, agreement, or otherwise, Haynes may file an amended proof of claim for one half of the remaining balance of the debt, which, after deduction of the $150,000.00 (but with no reduction for costs, interest, and attorney fees), should be $218,109.52. Because that balance is unsecured, no interest, costs, or attorney fees shall accrue.

IT IS SO ORDERED.

---

7. Federal Rule of Bankruptcy Procedure 7013 is mirrored by Arkansas Rule of Civil Procedure 13.